## THE PEOPLE OF THE STATE OF NEW YORK, RESPOND-
ENT, *v.* SARAH E. DRAKE, APPELLANT.

*Crimes — when evidence of other like crimes of the accused is inadmissible — specific acts are not competent to impeach character.*

Sarah E. Drake was convicted of the crime of assault in the third degree, the complainant, C. M. Dickinson, alleging that Drake pointed a loaded revolver at him, which she denied. In the Court of Sessions evidence was admitted tending to show that at various times, extending over several years, Drake had had a revolver, and had shot at, or had threatened to shoot, different persons. None of these alleged assaults were, however, in any manner connected with the crime in question.

*Held,* that the admission of this evidence was improper.

That the effect of the evidence was to present for the consideration of the jury other crimes of the accused, as to the commission of which she was not on trial.

That the evidence was not admissible to impeach the character of the accused, since independent and specific acts are not competent for such a purpose.

That as the question of the guilt of the accused was a close one, the admission of this testimony could not have been otherwise than prejudicial to her.

APPEAL by the defendant Sarah E. Drake from a judgment of the Court of Sessions of Broome county, rendered on the 17th day of October, 1891, convicting her of the crime of assault in the third degree; and also from an order, entered in the office of the clerk of the county of Broome on the 19th day of October, 1891, denying a motion for a new trial.

The people gave evidence upon the trial tending to establish the crime alleged in the indictment. Charles M. Dickinson testified that Sarah E. Drake threatened him and pointed a loaded revolver at him. Thereupon the defendant was sworn as a witness and denied the essential parts of the testimony given by the complainant, and denied the threats testified to by the complainant, and testified: " I never uttered such a word in my life, ' that if you don't give me the farm I intend to have your heart's blood;' and I never used anything like it; there was nothing of the kind occurred between us; he has told a falsehood when he tells any such thing as that; at that interview I didn't use any such language as that; I never used it in my life to anyone; to him or anyone else; * * * I never had a pistol when I was up in the woods in my pocket; I never had a pistol in my pocket; I don't carry any at all for nothing; I have

not had in my possession within the last year or eighteen months a revolver; Mr. Dickinson is mistaken when he says I had a pistol in my pocket in the woods; I did not have such a revolver, pistol or firearm; I never went armed in my life; * * * I did not have in my possession a firearm, revolver or pistol; I had my fan; * * * that day that I met Mr. Dickinson on the walk I had that fan with me; I did not have my shawl on my arm that day; I did not take out a revolver and point at him; I did not point a loaded revolver; I didn't have any shawl and no revolver that day; I did not take a revolver from under my shawl and point it at him; what I had in my hand was that rubber cloak and that fan; I did not say to him 'Now I am going to kill you;' I did not use that language to Mr. Dickinson, or anything like it; I made no threats on his life that day or at any other time."

She was asked on her cross-examination if she ever carried a pistol and her answer was "No." She was asked if, about the month of June, she "threatened to shoot Johnny Fee with a pistol or revolver?" and upon that question being objected to, the court allowed, over an objection and exception, the witness to answer the following question: "Q. Did you not in about the month of June or July this past summer, 1891, have in your possession a revolver or pistol?" She answered: "I did not." She was also asked: "Q. Did you not draw a pistol and threaten to shoot James Murphy sometime during the past year?" The question was objected to; an exception was taken, and the witness answered: "I did not." She was also asked: "Q. Did you draw a pistol and threaten to shoot this man Hanyon sometime during this present year?" The question was objected to; an exception was taken, and the witness answered: "I did not." She was asked: "Didn't you draw a pistol and threaten to shoot Stephen Pettis?" Objection and exception taken, and she answered: "I didn't." She was asked: "Did you go to Caleb Gage's blacksmith shop, in Hawleyton, with a loaded revolver in your hand and threaten to shoot his dog?" Upon objections being taken to the question the court observed: "I will admit this question as bearing simply upon the fact as to whether she had a pistol in her hand and possession." Defendant took an exception to the ruling, and the witness answered: "I did not." Then a question was put: "Q. Did you draw a revolver or pistol to shoot A. B. Hayden on your prem-

ises or in your barn within three years?" Upon the objections being stated to the question, the court observed : "I will admit that only as I have before — as merely upon the question as to whether she had a revolver in her possession — simply bearing upon that question." An exception was taken, and the witness answered : "I did not." She was also asked : "Q. Did you not about three years ago meet John Giblin and his hired man Murphy in Hawleyton and draw a pistol and threaten to shoot him, John Giblin?" Upon objections being stated to the question, the court observed : "Admitted upon the question as to whether she had a pistol in her possession at that time only." An exception was taken by the defendant, and she answered : "I did not."

By way of reply to the defendant's evidence, the People called Caleb Gage and put to him the following question : "Q. Did you remember an occasion of her going past your shop and having a revolver in her hand ?" The witness answered : "I do." "Q. Threatening to shoot your dog ?" "A. Yes, sir." "Q. State, if you can, what it was, and when it was ?" This was objected to, and the court observed : "You may ask the witness the question that you put to Mrs. Drake." Defendant took an exception. "A. That was some five or six years ago ; I could give the exact time." It was again objected to and overruled, and an exception taken by the defendant, and the court observed : "It is distinctly understood that this evidence is admitted only upon the question as to whether this defendant ever had a pistol in her possession." "Q. At that time did she have a pistol in her hand and threaten to shoot your dog ?" Objections were again stated, and the court observed : "The objection is overruled within the ruling already laid down by the court." An exception was taken, and the witness answered : "She did."

Peter Vosburgh was called as a witness for the people, and he was asked : "Q. State whether on that occasion Mrs. Drake had a pistol and threatened to shoot his dog ?" Objections were taken, and an exception, and the witness answered : "Yes, sir ; she did."

John Giblin was called for the People and testified : "Q. Did Mrs. Drake about three years ago meet you and your hired man Murphy in Hawleyton and draw a pistol and threaten to shoot you ?" Objections were stated, and exception taken, and the witness allowed to answer : "It is a mistake ; there is no such talk." "Q. I refer

to a conversation at her house, not in the streets of Hawleyton, but in her house at Hawleyton? A. That was in the summer of 1885 or 1886." This was objected to by the defendant on the further ground "that her attention was not called to the time and place."

Julia Stewart was called as a witness for the people and asked: "Q. I will repeat the question — Did you in May last see Mrs. Drake and John Fee on Pennsylvania avenue in this city, and at that time did you see Mrs. Drake draw a revolver and threaten to shoot John Fee?" Objections were stated and overruled, and the defendant took an exception, and the witness answered: "I saw her draw a revolver. Q. Threaten to shoot him? A. Whether she said she would shoot him or not I couldn't say, but she said she would fix him. Q. You saw her draw a revolver and make that remark? A. Yes, sir."

Laura Thiele was called by the people, and the following question was put to her: "Q. At this time in May, did you see Mrs. Drake, on Pennsylvania avenue, in this city, draw a revolver or pistol and threaten to shoot John Fee?" Objected to. Objection overruled and the defendant answered: "I saw her draw a revolver and say she would fix him; I wouldn't say positively she said she would shoot him; it is so long ago I have forgotten, but she said she would fix him."

William Hayden testified in behalf of the people; he was asked: "Q. Did Mrs. Drake, at that time, draw a revolver and threaten to shoot you?" Objections were stated. Overruled. An exception was taken, and the witness answered, "Yes, sir." "Q. How did she have the revolver?" "A. She had it right in her hand; pointed it towards me."

A. B. Hayden was sworn for the people, and testified to having a conversation with the defendant in 1887, and the following question was asked: "Q. In that conversation, did Mrs. Drake draw a revolver or pistol and threaten to put a hole through you if you did certain things?" This question was objected to on the grounds before stated, and on "the ground that her attention was not called to any such time." The objection was overruled. The defendant took an exception, and the witness answered, "Yes, sir. Q. Was the pistol fired on that occasion? A. Shot off as I went out of the barn."

James H. Dunn was called as a witness for the people, and proved by him that he called on Mrs. Drake about six years before, to settle an account; and then put to him the question: "Q. Did Mrs. Drake, in that conversation, take a pistol or revolver from a drawer?" Objections were stated. An exception taken, and the court observed: "It is only received on the question as to whether she had a pistol in her possession." The witness answered: "That is what she called it. Q. Did she take this pistol in her hands and say to you that is the way she pays her debts? A. She said that is the way she would pay me; I don't know whether she paid others that way or not."

*A. A. White*, for the appellant.

*W. D. Painter*, district attorney, for the respondent.

HARDIN, P. J.:

In the *People* v. *Gibbs* (93 N. Y., 470), it was held, viz.: "Upon trial of an indictment for assault, with intent to kill, evidence showing the commission by the prisoner of another similar assault, at a different time and place and upon a different person, is not competent." In the course of the opinion delivered in that case, it was said: "The effect of the evidence was to present to the jury testimony relating to another assault and to an entirely different transaction, which might well tend to prejudice their minds against the defendant in reference to the charge for which he was on trial."

In *People* v. *Sharp* (107 N. Y., 467), PECKHAM, J., said: "The general rule is that when a man is put upon trial for one offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and that, under ordinary circumstances, proof of his guilt of one or of a score of other offenses in his lifetime is wholly excluded."

In *Commonwealth* v. *Jackson* (132 Mass., 16), in the course of the opinion it was said: "Evidence of the commission of other crimes by a defendant may deeply prejudice him with the jury, while it does not legally bear upon his case. It certainly would not be competent, in order to show the intent with which one entered a house or took an article of personal property, to prove that he had committed a burglary or larceny at another time. * * * Such evidence compels the defendant to meet charges of which the indict-

ment gives him no information, confuses him in his defense, raises a variety of issues, and thus diverts the attention of the jury from the one immediately before it, and by showing the defendant to have been a knave on other occasions creates a prejudice which may cause injustice to be done him."

In *People* v. *Wood* (3 Parker's Crim. Rep., 684) it was said: "It is quite true that the prosecution cannot prove the commission of another and distinct felony by the prisoner for the purpose of establishing the fact directly that he committed the one for which he is then on trial, or for the purpose of raising any direct inference in the affirmative of the principal issue. The civil law allows such evidence. * * * But the common law, with more humanity and better logic, forbids such evidence in support of the principal issue, and limits its admission to minor issues, such as motive and scienter, and even then confines it to cases where there is some apparent connection or relation between the imputed motive or guilty knowledge and the felony proposed to be proved."

In *People* v. *Greenwall* (108 N. Y., 296) the defendant was called as a witness in his own behalf, and upon being cross-examined as to his connection with another burglary at the house of one Mohring, and in the cross-examination as well as in the re-examination, he denied that he had ever entered any man's house in the night-time with intent to steal. Subsequently Mohring was called to the stand by the prosecution and permitted to testify, under objection, to evidence showing that the defendant did burglariously enter his house in the night-time. The ruling admitting such evidence was held to be erroneous; and it was also held in that case that the incompetent evidence was damaging in its nature and could not be said to have been harmless, and, therefore, its reception required a reversal. In the course of the opinion in that case it was said: "It is never competent upon a criminal trial to show that the defendant was guilty of an independent crime not connected with or leading up to the crime for which he is on trial, except for the purpose of showing motive, interest or guilty knowledge, and this evidence was not proper or competent for that purpose. * * * It is never proper for the purpose of impeaching the character, of a party or a witness, to call witnesses to prove specific acts of dishonesty, immorality or crime." Under the rulings made by the court,

threats made by the defendant upon other occasions to other parties had no such connection with the crime alleged in the indictment as to render them admissible upon the issues before the court ; nor can their reception be justified upon the assumption that they tended to impeach the character or standing of the defendant as a witness. Independent and specific acts and deeds of a party are not admissible for the purpose of impeaching a witness. The testimony thus improperly received may have had a potential influence upon the jury. While the testimony offered for the prosecution tended quite strongly to support the allegations in the indictment, the testimony in behalf of the defendant contradicted the evidence of the prosecution and left a close question of fact to be considered by the jury. Under such circumstances we may not say that improper evidence was not prejudicial to the rights of the defendant. (*People* v. *Loftus*, decided by this court in November, 1890, as appears in 58 Hun, 606.)

The foregoing views lead to a reversal.

MARTIN and MERWIN, JJ., concurred.

Conviction, order and judgment of the Court of Sessions of Broome county reversed and the clerk directed to enter judgment and remit certified copy thereof with the return and decision of this court to the Court of Sessions of Broome county, pursuant to sections 547 and 548 of the Code of Criminal Procedure.